UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MATRIX GROUP LIMITED, INC.,        )
                                   )
            Plaintiff,             )
                                   )
    vs.                            )        Case No. 4:04CV00126 ERW
                                   )
RAWLINGS SPORTING GOODS CO., INC.  )
and K2, INC.,                      )
                                   )
            Defendants.            )

## MEMORANDUM AND ORDER

This matter comes before the Court upon Defendant Rawlings Sporting Goods Company, Inc.'s Motion for Judgment Notwithstanding the Verdict as to the Jury's Verdict for Damages for a Period Beyond 10 Years [doc. #205], Plaintiff Matrix's Motion to Strike Exhibit to Defendant's Post-Trial Brief not Admitted at Trial [doc. #230], Defendant K2, Inc.'s Motion for Judgment Notwithstanding the Verdict as to Count 9 (Tortuous Interference) [doc. #201], and Defendants' Motion for a New Trial [doc. #203].

## I.    BACKGROUND FACTS

The five-day trial in this matter began on May 2, 2005.  One issue to be determined at trial was a breach of contract claim by Matrix against Rawlings concerning a certain agreement which gave Matrix an exclusive license to use the Rawlings trademark ("License Agreement").  To prove its damages, Matrix relied upon the expert testimony of Donna Smith.  Ms. Smith's damage calculation consisted of three elements, two of which are relevant here.  First, Ms. Smith calculated

Matrix's damages for the ten years following the breach by making certain assumptions, projecting potential profits, and discounting those profits to present-day value. Second, Ms. Smith stated that, due to certain characteristics of the License Agreement, it would have value beyond the initial ten-year period, and she provided her opinion as to what that value would be. This second element of Matrix's damages is referred to as "terminal value damages." At the close of Matrix's evidence, Defendants moved for a directed verdict as to Matrix's claim for terminal value damages, and they renewed their Motion at the close of all of the evidence. The Court took the Motion under advisement and submitted Matrix's claim for terminal value damages to the jury on a special verdict form so that any terminal value damages would be separate from any other damages awarded by the jury. On May 9, 2005, the jury returned a verdict in favor of Matrix, awarding Matrix $4,096,312.00 against Rawlings for the first ten-year period, and $2,053,688.00 against Rawlings for the period beyond ten years.

A second issue to be decided at trial was a tortious interference claim by Matrix against K2. K2 moved for a directed verdict and judgment in its favor, both at the close of Matrix's evidence and at the close of all of the evidence, on the grounds that Matrix failed to make a submissible case as a matter of law against K2 for tortious interference with advantageous business relations. The Court took K2's motions under advisement and submitted Matrix's claim to the jury. The jury returned a verdict in favor of Matrix and against K2 in the amount of $2,500,000.00.

Rawlings and K2 now renew their motions for judgment as a matter of law. They also argue that they are entitled to a new trial because the verdicts in this case are against the weight of the evidence.

## II.    LEGAL STANDARDS

### A.    Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50(b):

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.

Fed. R. Civ. P. 50(b).  The inquiry on a motion made pursuant to Rule 50 ("Rule 50 motion") is the same as that for summary judgment.  *Kinserlow v. CMI Corp.*, 217 F.3d 1021, 1025 (8th Cir. 2000).  The issue is "[w]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.*  Therefore, a court must not disturb the jury's verdict unless "no reasonable juror could have found for the non-moving party based on the trial record."  *Sanders v. May Dep't Stores Co.*, 315 F.3d 940, 943 (8th Cir. 2003).  A Rule 50 motion should be granted where the plaintiff fails to make a submissible case of the required elements of a cause of action.  *See Charles Woods Television Corp. v. Capital Cities/ABC, Inc.*, 869 F.2d 1155, 1160-61 (8th Cir. 1989).

When deciding a Rule 50 motion, the court draws all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence.  *Kipp v. Missouri Hwy & Transp. Comm'n*, 280 F.3d 893, 896 (8th Cir. 2002); *Kinserlow*, 217 F.3d at 1025.  A reasonable inference is one which may be drawn from the evidence without resort to speculation.  *Kinserlow*, 217 F.3d at 1026.  Accordingly, judgment as a matter of law should be granted if the record contains no proof beyond speculation to support the verdict.  *Id.*  A court should grant a Rule 50 motion "when all of the evidence points one way and is susceptible of no reasonable inference

sustaining the position of the nonmoving party." *Id.* (internal quotations omitted). Importantly, a court must assume that the jury resolved all conflicts of evidence in favor of the non-moving party. *Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1158 (8th Cir. 2003). Moreover, a court must take as true those facts which tended to be proved by the prevailing party. *Id.* In short, a court should deny a Rule 50 motion if "reasonable jurors could differ as to the conclusion that could be drawn from the evidence." *Id.* (internal quotation omitted).

B.     Motion for New Trial

A motion for a new trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). "A district court may grant a new trial on the basis that the verdict is against the weight of evidence, if failing to do so would result in a miscarriage of justice." *Harris v. Secretary, U.S. Dep't of the Army*, 119 F.3d 1313, 1318 (8th Cir. 1997). A new trial is warranted if the court concludes "that the jury quite clearly reached a seriously erroneous result in spite of the clear weight of evidence." *Leichihman v. Pickwick Intern.*, 814 F.2d 1263, 1267 (8th Cir. 1987) (internal quotation omitted). In making this determination, a court can rely on its own reading of the evidence and is permitted to weigh the evidence. *Harris*, 119 F.3d at 1318. The Eighth Circuit has cautioned, however, that a court "may not reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Id.* (internal quotations omitted).

## III.    DISCUSSION

A.    <u>Motion as to the Jury's Verdict for Damages for a Period Beyond 10 Years</u>[1]

In its Motion, Rawlings argues that Matrix's claim for terminal value damages is not supported by Delaware law, is speculative, and is without evidentiary support.    According to Rawlings, the terminal value calculation provided by Matrix's expert is merely a far-reaching projection of lost future profits and is speculative as a matter of law.    In opposing the Motion, Matrix states that the jury's award reflects the jury's assessment of the remaining value of the License Agreement as an asset, in accordance with the established valuation methodology employed by Matrix's expert.

1.    *Measuring Terminal Value Damages*

In making damage determinations, courts recognize that, in some instances, one party's actions can cause another party to lose an income-producing asset, "the fair market value of which

---

[1]As an initial matter, the Court notes that Matrix has filed a Motion to Strike Exhibit to Defendant's Post-Trial Brief not Admitted at Trial [doc. #230].  In the Motion to Strike, Matrix argues that the Court should strike from the record Exhibit 2 to Defendant's Reply because the exhibit was not admitted into evidence at trial.  Matrix further states that Rawlings used the exhibit "to support an argument that is patently incorrect, and which Rawlings did not raise in its memorandum-in-chief."  Pl. Mtn to Str. at 1.  Matrix then uses the majority of its memorandum to explain why the arguments raised in Rawlings's Reply should be rejected.  In opposing the Motion to Strike, Rawlings states that Matrix's Motion amounts to a device for Matrix to submit a surreply without leave to do so.  Rawlings then uses the majority of its memorandum to respond to the points raised by Matrix.

Rawlings does raise arguments and does cite to caselaw in its Reply which it did not provide in its opening memorandum.  However, prior to Matrix's submission of its Memorandum in Opposition, it was not entirely clear that Matrix would rely on a lost-asset valuation theory to support its claim that the terminal value damages are not speculative.  Further, the Court agrees that Matrix's Motion to Strike is, in reality, more akin to a surreply.  In the interest of fairness to both parties, the Court will (1) deny the Motion to Strike because Matrix has failed to meet its burden of demonstrating why the exhibit should be stricken; (2) construe the Motion to Strike as a surreply with leave to file; and (3) construe Rawlings's Memorandum in Opposition to the Motion to Strike as a reply to the surreply with leave to file.

may be based, in whole or in part, on a buyer's projections of what income he could derive from the asset in the future." *Schonfeld v. Hillard*, 218 F.3d 164, 176 (2d Cir. 2000). As Rawlings points out, while both a lost profits and lost-asset damage analysis may involve some similar calculations, they are nonetheless analytically distinct. *Id.* at 177. A lost-asset damage analysis is based on an evaluation of future profits as estimated by potential buyers who form the market; the ultimate value assigned to the asset reflects the potential buyer's discount for the fact that future profits are necessarily uncertain. *Id.* at 176. Thus, lost-asset damages "represent what a buyer is willing to pay for the chance to earn the speculative profits." *Id.* at 177. As Rawlings points out, a recent Fifth Circuit opinion illustrates the distinction between a lost-profits and a lost-asset analysis. In *Fluorine on Call Ltd. v. Fluorogas Ltd.*, 380 F.3d 849 (5th Cir. 2004), a licensee sued the licensor for breach of a license agreement and fraud. The plaintiff's expert calculated the value of the lost asset (the license agreement) by using two lost-profit models based on various projections and then discounting the stream of future profits to present value. *Fluorine*, 380 F.3d at 860-61. However, the expert "did not analyze what a buyer would have paid for the chance to make these profits." *Id.* at 861. The expert failed to "do any of the calculations that distinguish a lost asset damage model from a straightforward lost-profits one. Instead, he calculated the value based solely on expected future profits." *Id.* Thus, the Fifth Circuit found that the record contained no evidence of the market value of the license, and determined that the award of lost-asset damages should be reversed. *Id.*

Importantly, under Delaware law,[2] speculative damages are not permitted. *See Chemipal Ltd. v. Slim-Fast Nutritional Foods Intern., Inc.*, 350 F.Supp.2d 582, 595 (D. Del. 2004). Rather, damages "must be proved with reasonable certainty and not left to conjecture." *Scotton v. Wright*,

---

[2]The parties agree that Delaware law governs the License Agreement.

121 A. 180, 185 (Del. Super. Ct. 1923). Though mathematical exactness is not required, a plaintiff may recover only those damages it is able to establish with reasonable certainty. *Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 561-62 (1941).

2.      *Matrix's Terminal Value Damage Calculation*

In this case, the point of disagreement between Matrix and Rawlings is whether the record supports the verdict from the jury awarding Matrix more than $2 million in terminal value damages. The evidence as to terminal value damages came primarily through the testimony of Matrix's expert, Donna Smith. In calculating Matrix's damages for the initial ten-year period, Ms. Smith relied upon certain factors she considered to be reasonable assumptions in light of the circumstances. She noted the companies' ten-year history together, Matrix's history of meeting its sales targets under the License Agreement and the likelihood that it could continue to do so, and her view that it is common to use a ten-year period when performing valuations such as the one she was requested to perform in this case. Ms. Smith then went on to testify that Matrix's damages were not limited just to the loss suffered during this initial ten-year period. In Ms. Smith's view, certain factors indicate that the License Agreement would have value beyond the initial ten-year period. In support of this contention, she stated that (1) the License Agreement had no termination date, (2) Matrix would continue to meet its sales requirement through 2028 even without any growth in current sales, (3) the Agreement could be sold or assigned to someone else, and (4) baseball is a very stable industry.

In arguing that the terminal value damage verdict should be permitted to stand, Matrix argues that Ms. Smith valued the License Agreement as an asset, and that the jury was entitled to award Matrix damages for the loss of this important asset. A review of Ms. Smith's testimony indicates that Matrix is correct in pointing out that, at several times throughout her testimony, Ms. Smith referred

to the License Agreement as an asset.  For example, she stated that she was trying to determine what someone might be willing to pay for the right to have the License Agreement, that someone else could own the License Agreement at some future time, and that, but for the wrongful termination, Matrix would have had the ability to sell the License Agreement to another willing party.  Ms. Smith explained that she calculated the remaining, or terminal, value of the License Agreement by using a particular kind of calculation that involves projecting cash flows into the future and discounting those amounts to present value.

A review of the record indicates that, while Matrix's contention that the jury could have reasonably concluded that the License Agreement would have some value at the end of the initial ten-year period may be correct, there was no evidence from which the jury could determine what that value would be.  A fundamental premise upon which a lost-asset valuation must rely is that the asset has some value to a third party.  Accordingly, a lost-asset valuation must necessarily include some analysis as to what that third party would be willing to pay for the asset that the plaintiff has lost as a result of the defendant's conduct.  Neither Ms. Smith nor any other witness provided this kind of analysis.  For example, the record contains no evidence – such as the potential market for sale of the License Agreement, comparable sales of similar agreements, or factors that might be considered in determining the price at which the License Agreement would be bought or sold – which might have helped the jury make a reasonable determination as to value.  In short, the record contains no evidence from which the jury could have determined that a third party would have purchased the Agreement for $2,053,688.00.  Like the flawed expert analysis in *Fluorine*, Ms. Smith's analysis as to the period beyond ten years is incomplete because it fails to consider the market value of the License Agreement.  Instead, her analysis as to the value of the License Agreement beyond the initial

ten-year period appears to essentially amount to a speculative lost-profits exercise.  Valuing an asset based on its potential to generate future profits is analytically distinguishable from valuing the asset on the basis of what some third party would be willing to pay for the opportunity to receive those future profits.

In defense of the jury's verdict, Matrix argues that the jury was entitled to credit certain factors identified by Mr. Orloff and Ms. Smith and testimony from adverse witnesses,[3] as well as use its own common sense, to determine that the License Agreement would have value beyond the initial ten-year period.  The evidence cited by Matrix, however, merely permitted a reasonable juror to conclude that the License Agreement would have some value at the end of the ten-year period.  It does not permit a reasonable juror to conclude what that value would be.  Without this necessary evidence, which Matrix had the burden to provide, the jury was left to speculate as to the remaining value of the License Agreement.[4]  Delaware law prohibits speculative damages.  The evidence of

---

[3]Matrix points to the following evidence: (1) Mr. Orloff and Ms. Smith testified that the License Agreement was not for a term of years and that it was continuous so long as Matrix continued to meet the minimum sales requirements, as it always had; (2) Liz Daus testified that the License Agreement was continuous, ongoing, and permanent; (3) Ms. Smith explained the various other factors she considered as supporting a calculation of the remaining value of the License Agreement as an asset, including the longevity and solid future of Rawlings, baseball, and sporting equipment bags; (4) Wayne Merck stated that he expected baseball to continue to be played for many years and acknowledged that K2 acquired Rawlings and Worth in the expectation that they would continue in business; (5) Mr. Catellano acknowledged that baseball would likely continue for the foreseeable future and that the License Agreement would have value at the end of the ten year period; and (6) Mr. Orloff noted that the license pertained to equipment bags intended to hold sports equipment of all types.

[4]Matrix argues that two questions submitted to the Court by the jury before the jury returned its verdict illustrate that the jury was focusing on the remaining value of the License Agreement at the end of the ten-year period.  Before returning its verdict, the jury asked (1) whether, after the conclusion of the case, Matrix would still be the Rawlings licensee, and (2) whether Matrix would be able to sell the Agreement to a third party.  Though these questions tend to indicate that the jury was focusing on the License Agreement's value as an asset, the

Matrix's terminal value damages rests on conjecture about the income-producing potential of the License Agreement into the extended future, and not on the License Agreement's value as an asset. Affording Matrix all reasonable inferences, the Court nonetheless must conclude that, as a matter of law, the jury's award of terminal value damages cannot stand because the award was the product of speculation. Therefore, the Court will grant Rawlings's Motion for Judgment Notwithstanding the Verdict as to the Jury's Verdict for Damages for a Period Beyond 10 Years, and will reverse the jury's verdict as to the claim for terminal value damages.

      B.    <u>Motion as to Tortious Interference Claim</u>

Count 9 of Matrix's Complaint consists of a claim for tortious interference with advantageous business relations against both Rawlings and K2. Prior to trial, the Court dismissed Count 9 against Rawlings on Defendants' Motion for Partial Summary Judgment. Prior to trial, the Court also dismissed one of Matrix's theories of liability as to K2, finding that K2's alleged direction of the termination of the License Agreement would have been justified and that the tortious interference claim against K2 on the basis of that theory was therefore not viable. Thus, at trial, there was no claim pending against K2 for tortious interference with respect to its alleged direction of the termination of the License Agreement. In response to Defendants' Motion for Partial Summary Judgment, Matrix also set forth a second theory of liability as to K2. Specifically, Matrix argued that K2 acquired Worth, combined the sales forces of Rawlings and Worth, thereby causing Rawlings to breach the License Agreement. On this second theory, the Court initially denied K2's Motion for

---

problem of the speculative nature of Matrix's damage calculation for the period beyond ten years remains. Though the jury may have attempted to value the License Agreement as an asset, there was no evidence in the record from which they could make such a valuation. Without evidence from which the jury could make such a determination, any award for the period beyond ten years was speculative.

Partial Summary Judgment. Upon Defendants' Motion to Alter or Amend, the Court concluded that a portion of its analysis as to this second theory had been in error and that K2 was entitled to demonstrate at trial that it was justified in acquiring Worth and consolidating the sales forces. K2 argues that the evidence at trial demonstrated that (1) K2 was justified in its acquisition of Worth and consolidation of the sales force; and (2) K2 did not employ improper means in taking such actions. According to K2, because its actions were justified as a matter of law and its means were not improper, Matrix failed to make a submissible case against it and the Court should reverse the jury's verdict.

      1.    *Tortious Interference*

To make a submissible case against K2, Matrix was required to establish the following elements: (1) the existence of a business relationship; (2) K2's knowledge of the relationship; (3) K2's intentional and unjustified interference with the relationship; and (4) damages to Matrix as a result of the breach of the relationship. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1994). According to the Florida Supreme Court,[5] provided "there is evidence proving the elements of tortious interference with a business relationship . . . set forth in *Ethan Allen*," Florida law recognizes "a claim for tortious interference against a corporation which purchases as a subsidiary a corporation which has a preexisting obligation not to compete." *Gossard v. Adia Services, Inc.*, 723 So.2d 182, 183 (Fla. 1998).

Importantly, Florida courts recognize that interference with business relationships may be justified. Under Florida law, "so long as improper means are not employed, activities taken to safeguard or promote one's own financial and contractual interests are entirely non-actionable."

---

[5]Florida law applies.

*Ethyl Corp. v. Balter*, 386 So.2d 1220, 1225 (Fla. Dist. Ct. App. 1980) (footnote omitted).  "It is clear . . . that 'the interference must be both direct and intentional.'" *McCurdy v. JC Collis*, 508 So.2d 380, 383 (Fla. Dist. Ct. App. 1987).  The privilege to interfere is not without limit.  "In those circumstances in which there is a qualified privilege to interfere with a business relationship, the privilege carries with it the obligation to employ means that are not improper." *Id.* at 384.  "[E]ven where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used." *KMS Restaurant Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004).  The finder of fact is entitled to consider all of the circumstances when determining whether improper means have been used.  *See McCurdy*, 508 So.2d at 384 (justification depends on balancing of importance of objective advanced by the interference against importance of interest interfered with, considering all circumstances, including methods and means used and relation of the parties).  Courts have found a variety of conduct to constitute improper means.  *See KMS Restaurant*, 361 F.3d at 1327 (collecting cases indicating improper means can include threats, intimidation, conspiratorial conduct, purposeful causing of a breach of contract, luring away potential buyers, physical violence, misrepresentations, illegal conduct, or other improper conduct).  It appears that the question of whether a defendant has engaged in conduct that goes beyond its privilege will generally be a question for the jury.  *See id.* at 1325 (noting that, in prior opinion, court had found that justification was question for jury); *McCurdy*, 508 So.2d at 385 (recognizing difficulties involved in malice determination in the case and concluding qualified privilege issue should be resolved by trier of fact).

2.    *Matrix's Claim for Tortious Interference Against K2*

Under Florida law, K2's actions in acquiring Worth and consolidating the sales forces would

not constitute tortious interference if K2 took the action to promote its own financial interests and did not employ improper means in doing so. K2 points to evidence in the record which it argues establishes that it did have a financial interest in the consolidation of Rawlings and Worth and that its actions were therefore justified as a matter of law.[6] Matrix responds to this argument by essentially conceding that there is evidence that K2 acted to promote its own economic interests with respect to the consolidation.[7] Matrix argues, however, that, even assuming K2 did have a financial interest in the consolidation, the evidence nonetheless supports a finding by the jury that K2 employed improper means, thereby rendering its interference tortious and without excuse. Thus, the real point of disagreement between the parties is whether the jury reasonably could have concluded that K2 employed improper means in the consolidation of Rawlings and Worth.

According to K2, the record in this case is devoid of any evidence which would support an inference that K2 acted with malice toward Matrix in acquiring Worth and consolidating the sales

---

[6]K2 points to the deposition testimony of Dudley Mendenhall, K2's Senior Vice President of Finance in which Mr. Mendenhall stated that the integration of the sales forces "was perceived to be a more meaningful opportunity for us from a financial standpoint, given the relative strengths of the two companies . . . . This was the overall driving rationale for the combination. That's really where the really meaningful financial opportunity was and therefore most of the focus was on that aspect." Pl's Tr. Ex. 123-A, p. 24, lines 9-20. K2 also points to the deposition testimony of Wayne Merck, K2's President and Chief Operating Officer, in which Mr. Merck stated that K2's desire was to have larger suppliers so that it might have stronger supply chains on which retailers could depend and in which he stated that, in making a consolidation decision, the president of the entity must "look for the optimum mix of how you improve the returns." Pl's Tr. Ex. 120-A, p. 51, lines 2-20.

[7]Matrix states that there was also evidence that Matrix had separate relationships with the Rawlings sales force and with retailers. Matrix claims that the jury reasonably could have concluded that K2 had no economic interest in these separate relationships. The import of this statement is not immediately apparent to the Court. In any event, Matrix does acknowledge that there is evidence from which the jury could conclude that K2 had a financial interest in acquiring Worth and consolidating the sales forces.

forces or that K2 intentionally interfered with Matrix's relationships. Def.'s Mem. in Supp. at 7-8. However, according to Matrix, there was evidence from which the jury could conclude that K2 did have the purposeful intention to cause a breach of the noncompete terms of the License Agreement, which interfered with Matrix's relationships. Matrix points to testimony establishing that K2 knew – prior to acquiring Worth and prior to consolidating the sales forces of Rawlings and Worth – that its actions would directly bring about a breach of the terms contained in the License Agreement, but that it nonetheless chose to go forward with its plans.[8] Matrix further states that the jury, in considering all of the circumstances when determining whether K2 had employed improper means, could have inferred that: (1) K2 knew, or had to know, the consequences of its actions, and K2 took the action with the intent to harm Matrix's relationships; (2) K2 knew about the contractual obligations of its acquired subsidiary, Rawlings, but chose to act in a way that would cause Rawlings not to honor those obligations; (3) K2 placed undue pressure on its acquired subsidiaries to consolidate and to meet the financial goals of the consolidation; and (4) Matrix's relationships were entitled to greater protection because they were existing, rather than prospective, relationships.

K2's argument is that it had a financial interest in acquiring Worth and combining the sales forces and that it employed no improper means in doing so. Thus, even if K2 is correct in its conclusion that the evidence demonstrates it did have the requisite financial interest, its argument

---

[8]Matrix points to a variety of evidence from which it argues a jury could conclude K2 intentionally and unjustifiably interfered, including the following: (1) K2 had a copy of the License Agreement by December 2002; (2) prior to the Worth acquisition, Mr. Orloff sent an e-mail to Rawlings's licensing agent indicating a potential breach if the acquisition of Worth moved forward; (3) Mr. Orloff informed Mr. Parish that the combination and integration of Worth with Rawlings would breach the License Agreement and interfere with Matrix's relationships with the sales force; (4) Mr. Merck, from K2, participated in the decision to consolidate the Worth and Rawlings sales forces; and (5) K2 took steps to cut costs and make changes at Rawlings.

nontheless fails unless no reasonable juror could have found that it used improper means in undertaking the interference. After reviewing the evidence and drawing all reasonable inferences in favor of Matrix, the Court is unable to conclude that no reasonable juror could have found that K2 employed improper means in acquiring Worth and subsequently consolidating the sales forces. The evidence is certainly susceptible to K2's conclusion that the acquisition of Worth and the subsequent consolidation of the sales forces was a financially-motivated decision taken with no intent to harm, or malice toward, Matrix or any of its business relationships. However, a reasonable juror could decline to accept this interpretation of K2's actions and could have instead drawn a different conclusion. For example, a reasonable juror could have concluded that K2 knew about the License Agreement, that it had been informed of the consequences of acquiring Worth and combining the sales forces, that it was dissatisfied with Matrix's performance and viewed Matrix as a drain on its resources, that it viewed Matrix as an obstacle to its plans for Rawlings and its other subsidiaries, and that it took these actions with the purpose of causing harm to Matrix's existing business relationships in an effort to rid itself of the obstacle created by having Matrix as the exclusive Rawlings licensee. Further, a reasonable juror could have concluded that K2 purposely caused Rawlings not to honor its contractual obligations and that K2 placed undue pressure on Rawlings in an effort to interfere with Matrix's relationships. A reasonable juror was entitled to consider all of the circumstances and could have concluded that, though K2 had a financial interest in acquiring Worth and consolidating the sales forces, K2 employed improper means in taking such action. In deciding K2's Rule 50 Motion, the Court is not permitted to weigh the evidence or make credibility determinations, and the Court must deny the motion if reasonable jurors could differ as to the conclusion to be drawn from the evidence. Whether K2 employed improper means was a question for the jury, and the Court

concludes that the jury verdict must be permitted to stand.[9]

### C.    Defendants' Motion for a New Trial

The jury in this case returned three verdicts: (1) in favor of Matrix and against Rawlings for Matrix's damages for the next ten years as a result of the breach of the License Agreement; (2) in favor of Matrix and against Rawlings for Matrix's damages for a period beyond ten years; and (3) in favor of Matrix and against K2 for K2's tortious interference.  Defendants argue that the jury's verdicts were against the clear weight of the evidence and that Defendants are therefore entitled to a new trial.  In light of the Court's conclusion in Part A, above, Defendants' argument as to the second verdict is moot.

With respect to the third verdict, Defendants incorporate the arguments set forth in their Motion for Judgment Notwithstanding the Verdict, as described in Part B, above.  Matrix counters that there was evidence to support the jury's finding of tortious interference.  As explained in Part B, above, after reviewing the evidence, the Court finds that there was sufficient evidence from which the jury could conclude that K2 tortiously interfered with Matrix's business relationships.  Though the jury certainly could have reached a different conclusion, the Court does not find the jury's third

---

[9]K2 also argues that there was no evidence regarding what, if any, damages Matrix sustained as a result of K2's alleged interference.  K2 argues that Matrix's failure to adequately establish the damages associated with the consolidation entitles K2 to judgment in its favor notwithstanding the jury's verdict.  As Matrix correctly points out, K2 did not raise this argument in its motion for directed verdict at the close of the evidence filed on May 6, 2005.  A "post-trial motion for judgment 'may not advance additional grounds that were not raised in the pre-verdict motion.'" *Walsh v. Nat'l Computer Sys Inc.*, 332 F.3d 1150, 1158 (8th Cir. 2003) (quoting *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197 (8th Cir. 1995)).  Thus, K2's argument regarding whether Matrix adequately established its damages with respect to the consolidation is not properly before the Court and cannot form a basis upon which the Court can grant K2 its requested relief.

verdict to be against the clear weight of the evidence. Thus, K2 is not entitled to a new trial on the tortious interference claim.

With respect to the first verdict, Defendants argue that Matrix's lost profits claim is based on a series of speculative assumptions which are unsupported by, and contradicted by, the evidence. Defendants argue that the verdicts are excessive in light of the evidence presented. Matrix responds by arguing that the jury was entitled to rely on the calculation provided by Matrix's expert in awarding Matrix damages for the first ten-year period. After considering the evidence supporting the first verdict, the Court concludes that, while the jury could have come to a different conclusion, the Court is unable to find that the jury reached a seriously erroneous result. The jury was entitled to find Ms. Smith to be a credible witness who made reasonable assumptions in conducting her analysis. The jury's verdict is not against the weight of the evidence. Therefore, the Court will deny Defendants' Motion.

D.     Reconsideration of Motion for Permanent Injunction

In an Order dated May 24, 2005, the Court considered Matrix's Motion for Permanent Injunction. In support of its Motion, Matrix argued that it was "entitled either to the full value of its damages from Rawlings' breach of the non-compete provisions, or a permanent injunction enjoining Rawlings and its affiliates from violating the non-compete provisions of the Agreement." Pl's Rep. Mem. at 3. The Court denied Matrix's requested relief after concluding that Matrix had received an adequate remedy at law for the breach of the License Agreement and that Matrix had failed to demonstrate that it would be irreparably harmed in the absence of a permanent injunction. In light of the Court's resolution of the post-trial motions, discussed above, the Court has reconsidered its May 24 Order denying Matrix's requested relief. After considering the record, the Court concludes

that it cannot grant Matrix its requested relief for the same reasons set forth in the Court's previous Order. The record indicates that Matrix has obtained an adequate remedy at law. Further, there is insufficient evidence in the record from which to conclude that Matrix will suffer irreparable harm in the absence of the requested relief.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Rawlings Sporting Goods Company, Inc.'s Motion for Judgment Notwithstanding the Verdict as to the Jury's Verdict for Damages for a Period Beyond 10 Years [doc. #205] is **GRANTED**. The jury's verdict in Plaintiff Matrix's favor on Plaintiff Matrix's claim against Defendant Rawlings for terminal value damages is reversed.

**IT IS FURTHER ORDERED** that Matrix's Motion to Strike Exhibit to Defendant's Post-Trial Brief not Admitted at Trial [doc. #230] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant K2, Inc.'s Motion for Judgment Notwithstanding the Verdict as to Count 9 (Tortuous Interference) [doc. #201] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for a New Trial [doc. #203] is **DENIED**.

Dated this <u>27th</u> day of July, 2005.

_E. Richard Webber_
_____

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE